CITY OF ST. LOUIS, A MUNICIPAL CORPORATION, PLAINTIFF, v. SENTER COMMISSION COMPANY ET AL., DEFENDANTS, JOHN R. THOMPSON COMPANY, A CORPORATION (DEFENDANT) APPELLANT, CHARLES S. BLOOD ET AL., (DEFENDANTS) RESPONDENTS.—108 S. W. (2d) 1070.

St. Louis Court of Appeals.   Opinion filed October 5, 1937.

*Richard S. Bull* and *Carter & Jones* for appellant.

*Frank X. Hiemenz* for respondents.

BECKER, J.—This appeal arises out of a suit in condemnation brought by the city of St. Louis to condemn land for the purpose of widening Market street. Among the defendants in that action was the appellant herein, John R. Thompson Company, a corporation, and the respondents Charles S. Blood, et al. The property involved in the instant case was the premises known as 604 Market street, owned by respondents Blood, the reversioners in fee, following a lease for ninety-nine years made in 1913 to John R. Thompson, who assigned the lease, in 1924, to the John R. Thompson Company, a corporation.

Upon the condemnation suit being filed by the city of St. Louis, a commission was appointed but exceptions were sustained to its award for this particular piece of property and a new commission appointed, to whose award in the sum of $70,091.66 no exceptions were filed, and the city of St. Louis, on May 25, 1932, paid the a-mount of the said award into the registry of the court for the use of the parties lawfully entitled thereto.

Thereafter the respondents, reversioners Charles S. Blood, et al., filed their application for payment of the entire award to them, and appellant John R. Thompson Company filed its application to have a portion of the award allocated and paid to it. From the judgment directing payment of the entire award to respondents Blood, et al., and denying the motion of appellant John R. Thompson Company to any part of the fund, the said Thompson Company in due course appeals.

At the hearing of the case the lessee introduced in evidence the lease upon the property. It ran for a term of ninety-nine years beginning January 1, 1913, and ending December 31, 2011. The rental prescribed was in the aggregate sum of $430,500, being at the rate of $3600 per annum for the first ten years; $4200 per annum for the succeeding twenty years; and $4500 per annum for the balance of the term. The lessee, in addition, covenanted to pay all general and special taxes and all assessments and charges whatsoever which should be assessed against the demised premises or its improvements during the term of the lease. The lessee further covenanted to keep the premises insured, and agreed, in the event of a

total destruction of the building, to erect a new building to cost not less than $45,000. The lease further provided that the lessee, at his own cost and expense, place the building then upon the demised premises in first class condition and repair, and that he expend in said permanent repairs, alterations and improvements the sum of not less than $10,000. The lessee had the privilege at any time during the term of the lease, to tear down any buildings which were then on said premises and construct a new modern building at his own expense, to cost not less than $45,000, provided that before proceeding to wreck and remove any of the buildings on the leased premises, the lessee execute and deliver to the lessors a bond in the penal sum of $45,000, to assure the proper construction of a building as required by the terms of the lease.

The lease further provided that the lessee keep the improvements upon the demised premises in good order and repair so that the same shall not substantially deteriorate, and upon termination of the lease surrender them to the lessor in good repair and condition, ordinary wear and tear alone excepted.

Over objection of counsel for the owners, and subject thereto, witnesses for the lease were permitted to testify that prior to the time of the execution of the lease in question, the building was in very bad repair, "the walls were partly down, the joists were rotted away, and most of the foundation gone. The floors of the upper stories were all gone and it was a very cheap lodging house; there wasn't any plumbing. It was not fit to inhabit or use for any kind of place." Witnesses further testified, over objection of respondents, that the lessee, in the year 1913, expended over $32,000 in reconstruction work on the building on the premises; that the net profit of the lessee from the restaurant which it operated in the building varied from year to year, increasing from approximately $11,000 in 1914, to a peak of over $25,000 in 1921; that after these years there was a falling off in the net profits until the profits in 1925 were but $15,000, and thereafter steadily decreased year by year until in 1931 the net profits were $4,544.50, and in the first seven months of 1932 the net profits were only $1,820.98.

Defendants owners of the property introduced J. H. Farish, Frederick G. Zeibig and Joseph W. Hanneuer, each of whom testified that he was and had been in the real estate business in the city of St. Louis for many years, and was familiar with the property in question as well as the value of property in the surrounding neighborhood. In response to hypothetical questions which contained the pertinent provisions of the lease, such as the rental reserved, the payment of taxes and all assessments by lessee, the obligation of the lessee to make repairs to the building and at the expiration of the lease to turn the building over to the lessor in good repair except-

ing natural wear and tear thereon, the condemnation of the property and the amount of award allowed therein, each of the witnesses testified that the leasehold estate had no market value either as of the date of May 26, 1932, when the lessee vacated the property, or as of the year 1922 in which the condemnation suit was filed.

Counsel for the lessee objected to the hypothetical questions put to the said witnesses adduced on behalf of the owners of the property on the ground that the questions did not include in their hypotheses the fact as to the expenditures for improvements made by the lessee, nor set out the profits arising from the operation of the restaurant in the building by the lessee, which objections were overruled with the statement that such facts might be elicited by questions on cross-examination.

The witness Farish, on cross-examination, reaffirmed his opinion that the unexpired term of the lease had no salable or market value, and when asked to consider the substantial improvements and costs thereof which the lessee had made to the building in 1913, and the fact that thereafter substantial profits had been made from operating the restaurant in the building, the witness stated that while the lease was of value to the Thompson Company, there would be no premium for the leasehold estate. This latter opinion he stated was based on the belief that no one could go in and make money out of the operation of the property over the payments required by the lease. Farish testified that the depreciation charged on the type of building and improvements existing thereon on property as a whole would be not less than three per cent per year.

The testimony of Messrs. Zeibig and Hannauer was to the same effect, namely, that there was no market value for the unexpired term of the lease.

The court, in rendering judgment in the case, filed a written memorandum from which it appears that the court sustained the motion of the owners of the property to strike out the testimony of the witnesses for lessee other than that relating to the reasonable market value of the leasehold interest, and entered judgment for the total award of $70,091.66 for the owners of the fee.

The appellant, lessee, urges here that "under the circumstances of this particular case the court adhered too strictly and blindly to the general rule relating to the measurement of lessee's damage; . . . that while the general rule has frequently been announced that the tenant will be considered as entitled to the present value of his leasehold interest over and above the rents payable during the term, yet the cases which apply that rule without any announced qualification, are those in which virtually all of the value of the property lay in the reversion, due primarily to the fact that short-term or expired leases were there involved, which gave little or no

value to the lessee's interest.  In other cases where the unexpired term of the lease at the time of condemnation or eviction were of a substantial period, or where the value of the leasehold interest lay in the continued and uninterrupted use of valuable improvements and fixtures, the general rule announced has usually been qualified.

". . . Apparently," argues appellant lessee "it was the opinion and the judgment of the court that the lessee was entitled to no allowance for any improvements, additions or fixtures installed by it, the court taking the narrow view that it was concerned only with the question of the reasonable market value of the lease.  Having regard to the fact that the lease had eighty years yet to run at the time of the tenant was required to vacate, in 1932, and to the fact that valuable improvements and investments had been made by the lessee for its use of the property, we contend that the trial court was in error in striking all of the evidence excepting that which related to the market value of the lease as based upon rentals, and that the court proceeded from this error into the other of refusing to allow any sum to the lessee and in directing payment of the entire award to the owners of the fee."

We have been cited no case, nor has our search found any in Missouri, which does not uphold the general rule that the lessee, where the property is taken under eminent domain, is entitled to the reasonable market value of the unexpired term of his lease.  [Biddle v. Hussmann, 23 Mo. 597; McAllister v. Reel, 53 Mo. App. 81; 59 Mo. App. 70.]

When the lessee entered into this lease he did so in light of the law as it then stood, and the cases we have cited from this jurisdiction, *supra,* clearly point out that the tenant holding an unexpired lease on property which is taken by the sovereign in the exercise of eminent domain, shall be entitled, out of the award made therefor, to the fair market value of the unexpired term of his lease.  The rule applied in McAllister v. Reel, *supra,* was to compute six per cent of the total amount of the award for the unexpired term of the leasehold estate, reduce this to its present cash value, then compute six per cent of the aggregate amount of rent the lessee would pay during the term of his lease if the term was not interrupted, and reduce this to its present cash value, substract the latter from the former and the balance thus obtained, if any, would represent the present market value of the unexpired term of the lease.  Obviously, under this rule, where a lessee pays his lessor a net rental of six per cent or more on the reasonable market value of the property over and above all taxes, insurance premiums, repairs, special taxes, levies and assessments, the lessee estate, where the property is taken by condemnation during the term of the lease, has no value.

Under the lease before us we find that the average net rent for the unexpired term of the lease was $4430 per year, whereas six per cent on the total award of $70,091.66 amounts to but $4205.50, so that the lessee would, under the rule as applied under the facts in McAllister v. Reel, *supra*, be viewed as paying an excess rental, and therefore his unexpired term of lease would be held to have no value.

A long term lease upon real estate is speculative in some of its aspects. If the lease, as here, be for ninety-nine years on property on the border-line of a business district of a large community, experience has shown that the value of such property may double or treble during the period of the lease, or it may shrink in value in equal proportion. Many forces act to change the value of real estate. The most experienced real estate operators frequently differ in their views as to what the future value of property will be, whether the trend of value will be up or down. Therefore, in light of this uncertainty as to the value of property over long periods of time, a lessor and lessee should see to it that the lease contains provisions to cover the many contingencies which may arise during the life thereof. One of these contingencies is whether the right of eminent domain will be exercised during the period of the lease, thereby taking a part of the property or even the entire property. Such taking of the property in condemnation may occur at any time during the period of the lease. In the case before us the city might have started its condemnation proceedings to take the entire property just when the lessee had completed its remodeling of the building on the property, or not until some sixty or seventy years later, at a time when the lessee had torn down the buildings that were on the property originally and had erected a new building at a cost provided for in the lease, namely, "in excess of $45,000." In this situation it behooves the lessee, if he is not content with the rule of law applicable in the jurisdiction where the property is located for determining the value of his leasehold in the event of condemnation of the property, or part of it during the term of his lease, to see to it that specific provision be made in the lease to protect his rights at all time throughout the term of the lease in the event the property is taken by condemnation.

Upon the record before us, and in light of the terms of the contract of lease, we are constrained to rule that the result arrived at by the trial court is in conformity with the rule of damages pertinent to the case.

The judgment should be affirmed. It is so ordered. *Hostetter, P. J.*, and *McCullen, J.*, concur.